No. 2--02--1330

IN THE 

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

WILLIAM WERST, ) Appeal from the Circuit Court of Kane 

) County.

Plaintiff-Appellant and Cross-Appellee, )

) 

v. ) No. 98--CH--419

) 

THREE FIRES COUNCIL OF THE BOY ) 

SCOUTS OF AMERICA and THE BOY ) 

SCOUTS
 OF AMERICA, )

) 

Defendants-Appellees and ) 

Cross-Appellants
 ) 

)

(Cornerstone United Methodist Church and )

Bruce Nelson, d/b/a B&G Train World, )

Plaintiffs; Suzette Heinze, Lawrence ) Honorable 

Harrington, David Clark, Daniel DeBruycker, ) Patrick J. Dixon,

and John
 Kemper, Defendants). ) Judge, Presiding.

JUSTICE CALLUM delivered the opinion of the court:

Plaintiff, William Werst, sued defendants, Three Fires Council of the Boy Scouts of America (the Council) and the Boy Scouts of America (BSA), seeking, 
inter
 
alia
, a declaratory judgment (735 ILCS 5/2--701 (West 2002)) that the revocation of Werst's BSA membership was inconsistent with the organization's rules.  In another count of Werst's 10-count amended complaint, Werst sought a writ of 
mandamus
 ordering defendants to reinstate his membership.  Following a bench trial on these two counts, the trial court ruled in favor of Werst on his declaratory judgment count and in favor of the Council and BSA on the 
mandamus
 count.  The court denied Werst's posttrial motion seeking reinstatement of his BSA membership.  Werst appeals the trial court's denial of the relief he sought in his posttrial motion.  The Council and BSA cross-appeal the court's order on the declaratory judgment count.  We reverse and remand the cross-appeal, and we do not reach Werst's issue.  

I.  BACKGROUND

Werst, an insurance producer, became associated with scouting in 1954.  He was a Boy Scouts volunteer from 1979 through March 10, 1997, when his BSA membership was revoked.  Werst served in various volunteer positions, including troop committee chairman, district chairman, district vice chairman, and Explorer Post adviser for Post 9911 (the Post).  Werst testified that, prior to his membership revocation, he had never been disciplined by the Boy Scouts.   

Werst was a founding member of the Post, which was chartered in February 1994.  Its founding members included, among others, Harold Gregory Meyer.  Initially, Werst served as Post adviser and Meyer served as an assistant adviser.

In 1994, Meyer, an attorney, was indicted for matters involving fraudulent financial transactions.  Werst found out about the indictment and scheduled a Post meeting to discuss Meyer.  The Post committee voted to revoke Meyer's membership, but it permitted him to attend Post activities with his son, who was a Post member.  Werst testified that BSA rules, as set forth in the Explorer Post Handbook, state that parents are permitted to attend scouting activities with their children.

Werst testified that, between 1995 and 1996, he had one discussion with Lawrence Harrington, Council vice-president, about Meyer's involvement with the scouts.  According to Werst, Harrington was concerned that Meyer was participating in Post activities.  Werst responded that he had not received any orders from the Council addressing Meyer and told Harrington that Meyer was no longer a member.  Harrington informed Werst that Meyer had been convicted.  Werst subsequently discovered that Meyer had pleaded guilty to felony theft in January 1997.

In 1995 and 1996, the Post participated in model railroad shows at Harper College in Palatine.  Meyer assisted the Post in setting up and tearing down its displays.  Werst testified that Meyer also may have been present at a meeting at which youth members were present, but he was not working with the youth as leaders do.  In February 1997, the Post sponsored Rail-O-Rama, a model railroad show, at Spring Hill Mall.  Meyer assisted members in setting up and breaking down their displays.  Before the event, Meyers was featured in a published newspaper article about the show.

On March 11, 1997, Werst received a letter from Daniel DeBruycker, Council commissioner, notifying him that his BSA membership had been revoked.  Werst testified that between January 1997 and March 10, 1997, he was not advised of any charges pending against him that would result in revocation of his scout membership.  According to Werst, he had only one conversation with Harrington about Meyer's indictment before revocation of Werst's membership.  Werst further testified that DeBruycker's letter did not state any facts upon which Werst's  membership was revoked, nor did it refer to any rules he allegedly violated.

On March 13, 1997, Werst spoke with Harrington about the revocation.  Harrington indicated that he would inquire about it, but thought that it was related to Meyer's conviction.  About one week later, Werst again spoke to Harrington.  Harrington stated that he had visited the Council office and found out that Werst's membership had been revoked because Meyer had been attending Post activities.  Harrington informed Werst that, notwithstanding anything the Post committee had decided, Meyer could not be involved in scouting.  Werst testified that he never received in writing an explanation as to why his membership was revoked.  He also testified that he elected to ignore Harrington's instructions because, in the scouting organization, not all statements could be believed.

Werst appealed his revocation to the regional BSA office.  In a letter dated June 24, 1997, John Kemper, assistant regional director of the central region of the BSA, notified Werst that the regional standards-of-leadership committee decided to uphold the Council's revocation of his membership.  Werst appealed to the national council, and, on May 21, 1998, that committee upheld the Council's action.

John Jones, one of the founding members of the Post, testified that, during the Post meeting to discuss Meyer's status, Werst did not inform the committee of his conversation with Harrington. At the meeting, Jones did not know that Meyer's membership had been revoked or that Meyer had been directed to sever all of his relations with the BSA.  Jones further testified that, had he known that the Council office instructed Meyer not to participate in Post programs when youth members were present, he would have followed that instruction.  According to Jones, during 1995 and 1996, Meyer attended between four to six Post meetings when youth members were present.  Since the Post meeting to discuss Meyer, the committee had not received any information in writing from the Council addressing Meyer's participation in scouting.

Harrington testified for defendants as follows.  Harrington, a retired railroader who has been involved in scouting since 1961, is a member of the executive board of the Council and serves on several committees.  In 1995 and 1996, he was Council vice-president and, in 1997, served as a member of the Council's standards-of-membership committee.  Harrington was a member of the committee that revoked Meyer's membership.

At a 1995 model railroad event at Harper College, Harrington saw Meyer assisting with the setup of the Post's modular railroad units.  Harrington told Werst that Meyer could not participate when youth were present.  Harrington testified that Werst did not respond.  At the 1996 Harper College event, Harrington again observed Meyer setting up a Post display and told Werst that Meyer should not be present when youth members are present.  On another occasion at Werst's office, Harrington observed Meyer working on a railroad layout when youth members were present.  Harrington mentioned to Werst that Meyer was present.  Harrington did not say more, he explained, because Werst knew Harrington's position.  Werst did not respond.  At the Rail-O-Rama event in February 1997, Harrington observed Meyer working at the modular units and talking to the scouts.  He also observed Meyer standing at a podium fielding questions from the public.

Harrington testified that he never ordered Werst to bar Meyer from attending scout functions because he did not have authority to do so.  He stated that the BSA expects its adult leaders to exercise good judgment and that Werst did not exercise good judgment in permitting Meyer to participate in Post activities.  However, Harrington could not identify any BSA rule that Werst violated.  

DeBruycker was Council commissioner in 1997 and a member of the standards-of-membership committee.  He testified that the committee held two meetings to discuss Werst's membership, one in late 1996 and one in early 1997.  Present at the meetings were Jim Burner, Harrington, Dennis Cook, and DeBruycker.  The committee decided to revoke Werst's membership and sent a letter, signed by DeBruycker, to Werst informing him of its action and setting forth his appeal rights.  According to DeBruycker, Werst exercised poor judgment in permitting Meyer to participate in Post activities.

Cook, scout executive of the Council, is responsible for the daily operations of the Council, a position he held in 1996 and 1997.  Cook testified that, in 1997, Harrington informed him that, on several occasions, he had advised Werst that Meyer was not to take part in Post programs.  Following the Rail-O-Rama event, Cook convened a meeting of the standards-of-membership committee.  The committee considered as evidence the newspaper article featuring Meyer and memos from Harrington and other scout employees.  The committee members decided to revoke Werst's membership.  The letter sent to Werst informing him of the committee's decision did not state the reason for the revocation.  Cook testified that scout procedures do not require an explanation.  He further explained that the committee contemplated other remedies, including increased supervision, additional training, probation, and temporary suspension.  Furthermore, the committee discussed Werst's membership with several individuals at the BSA national office.  
To maintain Werst's privacy, Post youth members were not interviewed when the committee reviewed his membership.

Between March and June 1997, Cook 
wrote seven letters about Werst to the BSA's central region standards-of-membership committee.  In a letter dated March 20, 1997, Cook wrote that Werst had permitted Meyer to participate in scouting activities in defiance of BSA policies and standards.  He also stated that Werst and Meyer "have been involved in efforts to disrupt district and council programs for over three years after the district chairman dismissed them for their lack of cooperation."  Cook explained that Werst was concerned only "with his own agenda" and did not represent the image of a positive role model.  Cook further suggested that it was "very important that [Werst's] suspension not be overturned" and, if it was reversed, then Werst "will see that action as a validation of his attacks and will renew his destructive efforts."

In letters addressed to Kemper,
 dated April 29, and June 5, 1997, Cook wrote that Werst's revocation was not an attempt to remove a "disgruntled volunteer" but rather to  remove one who, after over two years of repeated warnings, intentionally disregarded BSA policy.  Nevertheless, Cook explained that Werst had disrupted the scouting community over the past three years by running separate roundtables and district committee meetings, and submitting his own slate of officers at three district annual meetings.  In other letters, Cook wrote that Werst continued to disrupt scout meetings, even after his membership revocation, and continued to involve Meyer, but through the presence of Meyer's son at scout meetings.

Cook forwarded to the national office a memo dated March 21, 1997, that was written by Suzette Heinze, Council field director in 1997.  Heinze described Werst as a "disgruntled volunteer who had his own agenda and reasons for continuing as a volunteer" in scouting.  The bulk of the memo related various disruptive activities engaged in by Werst, including recruiting unqualified volunteers, attacking the Council, and heading a campaign to present alternate slates of officers. 

In a letter dated April 3, 1997, that Cook sent to Kemper at the central region,  David Clark, a district chairman in 1992 and 1993, explained how he first became aware of disciplinary issues with Werst in 1992 and 1993, when Werst was a disruptive influence at district committee meetings.  Clark further explained that Werst and Meyer held "secret" district committee meetings in 1994 and headed an effort to offer alternate slates of officers during  district campaigns.  Clark summarized that he felt that Werst "violated the spirit of scouting and has worked against the normal processes of the voluntary adult leadership."

The BSA's "Procedures for Maintaining Standards of Membership" manual (the Manual) states that it derives its authority from the organization's bylaws, which provide that "[n]o person shall be approved as a leader unless, in the judgment of the Corporation, that person possesses the moral, educational, and emotional qualities deemed necessary for leadership and satisfies such other leadership qualifications as it may from time to time require."  The Manual outlines, among other things, the procedures to be followed upon receiving an allegation of misconduct that does not involve child abuse. 
 They include: confidentially gathering available information; visiting the individual who made the allegations;  and examining allegations that appear to have substance.

The Manual further outlines two levels of review of a council's revocation decision, first at the regional level and next at the national level.  The Manual outlines the regional review process as follows: the applicant must request review and submit his or her version of the facts.  The review committee must determine whether the file submitted is sufficient to substantiate revocation of membership and whether it is complete.  The review committee is not required to, but may, hold a hearing and interview the applicant.  The committee must apply the standard quoted above from the bylaws.

On May 31, 2002, the trial court entered judgment in favor of Werst and ordered that Werst be granted a new hearing on his membership before a newly constituted committee.  It found that the revocation was done in a manner that was grossly unfair and unjust because Werst did not violate any written BSA standard, order, or directive.  Further, the court found that the committee did not act in accordance with its own procedures because it did not verify the accusations and assumptions that formed the basis of the charges against Werst.  Accordingly, the court found that Werst's fundamental right to a fair hearing was violated.  It pointed out that the committee consisted of one member--Harrington--who was Werst's primary accuser.   Additionally, the court found that the review and appeal process was compromised by Cook when he communicated extraneous information and predicted dire consequences if the review committees overturned the revocation.  Finally, the court found that key employees had an animus that suggested collusion.  As to the 
mandamus
 count, the court found in favor of defendants and dismissed the count.  On September 10, 2002, the trial court found that there was no just reason to delay enforcement or appeal of its May 31, 2002, order. 
 
155 Ill. 2d R. 304(a).

Werst subsequently filed a posttrial motion seeking reconsideration and/or clarification of the trial court's May 31, 2002, order.  He requested, 
inter
 
alia
, that the court make an explicit finding that his membership was in good standing, arguing that this was implicit in the court's finding that he violated no scouting standard.  The trial court denied Werst's motion.  Werst appeals the denial of his posttrial motion, and the Council and BSA cross-appeal the court's judgment in Werst's favor on the declaratory judgment count.

II.  STANDARD OF REVIEW

The grant or denial of declaratory relief is discretionary and will not be overturned on appeal absent an abuse of discretion.  
State Farm Fire & Casualty Co. v. Leverton
, 314 Ill. App. 3d 1080, 1083 (2000).  An "abuse of discretion" is clearly against logic.  The question is not whether this court agrees with the trial court, but whether the trial court acted arbitrarily, without employing conscientious judgment, or whether, in view of all the circumstances, the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.  
Bodine Electric of Champaign v. City of Champaign
, 305 Ill. App. 3d 431, 435 (1999).  

III.  ANALYSIS

A.  BSA's and the Council's Cross-Appeal

Preliminarily, BSA and the Council assert that declaratory relief was improperly granted in this case because the alleged actions justifying such relief related to past conduct, and Werst offered no evidence suggesting any controversy of sufficient immediacy to justify a declaratory judgment.  We disagree.

The purpose of the declaratory judgment statute is to permit the court to address a controversy one step sooner than normal, after a dispute has arisen, but before steps are taken that would give rise to a claim for damages or other relief.  
Bank of Chicago-Garfield Ridge v. Park National Bank
, 237 Ill. App. 3d 1085, 1096 (1992).  The declaratory judgment procedure allows parties to a dispute to learn the consequences of their actions before acting.  
Eyman v. McDonough District Hospital
, 245 Ill. App. 3d 394, 396 (1993).  However, a declaration of nonliability for past conduct is not a function of the declaratory judgment statute.  
Howlett v. Scott
, 69 Ill. 2d 135, 143 (1977). 

Although not addressing the appropriateness of declaratory relief, such relief has been granted where an association disciplined one of its members.  See 
Kendler v. Rutledge
, 78 Ill. App. 3d 312, 319 (1979) (real estate broker's declaratory judgment action challenging board of realtors' imposition of sanctions; court remanded with directions to grant member a new hearing in conformity with board's bylaws). We disagree with BSA's and the Council's characterization of the controversy.  At issue here is not merely the BSA's 1997 revocation decision, but Werst's membership status and rights.  We conclude that Werst essentially asserts an ongoing controversy. Accordingly, declaratory relief is an appropriate remedy.

Turning to the merits of their cross-appeal, BSA and the Council argue that the trial court erred in finding that Werst was entitled to a new hearing on the revocation of his membership.  They contend that they followed their rules and procedures and that they accorded Werst his fundamental right to a fair hearing.  

The trial court first found that BSA and the Council did not follow their own rules in revoking Werst's membership when the committee that revoked his membership did not first verify the accusations asserted against Werst.  Second, the court concluded that BSA and the Council did not accord Werst his fundamental right to a fair hearing.  Third, the court found that there was a showing that key scout employees and agents had an animus that suggested collusion.  We review in turn the court's findings.

1.  
Scout Rules

BSA and the Council first argue that the evidence did not support the court's finding that they did not comply with their rules and procedures.  They maintain that the rule the court specifically mentioned in its order does not apply to Werst and is not mandatory.  

"In churches, lodges, labor unions, and other like voluntary associations, each person on becoming a member, either by express stipulation or by implication, agrees to abide by all rules and regulations adopted by the organization.  [Citation.]  Courts will not interfere to control the enforcement of by-laws of such associations, but they will be left free to enforce their own rules and regulations by such means and with such penalties as they may see proper to adopt for their government."  
Engel v. Walsh
, 258 Ill. 98, 103 (1913).   Generally, the scope of judicial inquiry is confined to the question of whether the association's action was in compliance with its own rules.  
Finn v. Beverly Country Club
, 289 Ill. App. 3d 565, 568 (1997);  
Lee v. Snyder
, 285 Ill. App. 3d 555, 559 (1996). 

Relying on the Manual, the court found that BSA and the Council did not complete a check on any information concerning Werst's membership "before making any commitments."  It further found that the committee that revoked Werst's membership did not verify the assumptions and accusations that formed the basis of the charges against Werst.  

Upon review of the Manual, we agree with BSA and the Council that the rule does not apply to Werst.  The rule, in a section entitled "Ineligible Volunteer File" and in a subsection entitled "Check Concerns with Director of Registration Service, BSA," states: 

"An individual may approach a council in order to register with the BSA, and something unusual may arouse concern.  Further checking should be done.  The Scout executive should write or phone directly to the director of Registration Service to ask for a check on information that might be on file concerning the individual.  Such a check should be completed before making any commitments that could prove to be embarrassing later.  A call to a former council may also prove helpful."

The foregoing provision clearly applies to individuals who are first applying for BSA membership or who are former members seeking to reapply.  As Werst was a member when the standards-of-membership committee considered his membership status, the provision does not apply to Werst.  Accordingly, the trial court's reliance on this provision constituted an abuse of its discretion.

The trial court did not specify any other BSA rules that were violated.  Werst argues that BSA and the Council did not conduct a proper investigation because no scout employee spoke to him about the review of his membership status.  This is not the case, as Werst himself testified that he had multiple conversations with Harrington about Meyer's participation in Post activities.  Werst acknowledged that Harrington was his superior in the scout hierarchy and admitted that he did not take Harrington's advice.  Werst's contention that he had no opportunity to be heard is further belied by the BSA appeals process.  BSA procedures provide that the review process is initiated only upon a written request from the applicant and must include the applicant's version of the facts.  Werst wrote to Kemper at the regional office, offering his viewpoint on the controversy.  Thus, he had an opportunity to be heard.

Werst also argues that the regional review process was improperly executed because there was no memorandum of findings produced by the regional review committee.  He maintains that BSA rules require such written findings.  We disagree.  

The relevant procedure states:

"10.  The review committee should meet (a telephone conference call is acceptable) and formulate its questions before the hearing.  During the hearing, a member of the review committee 
must
 take notes.  At the conclusion of the hearing, the review committee 
should
 confer, review the notes taken, and reach a majority vote.  One member of the committee 
should
 then draft a memorandum setting forth the finding of fact and the determination of the review committee." (Emphasis added.)

A later procedure instructs, in relevant part:

"12.  The memorandum setting forth the findings of the regional review committee, after being reviewed by the Registration Service at the national office, 
should
 be sent to the applicant with a cover letter from the regional director."  (Emphasis added.)

As is clear from the emphasized terms, the drafting of a memorandum of the review committee's findings of fact is not mandatory but precatory.  See 
Culbert v. Young
, 834 F.2d 624, 628 (7th Cir. 1987) (word "should" is permissive rather than mandatory).  Indeed, the manual's use of mandatory terms, as evidenced by the provision relating to notetaking, further supports the conclusion that the use of the word "should" is intended to be merely precatory.  

2.  
Bias

Next, BSA and the Council argue that, per BSA rules, Werst did not have a fundamental right to a hearing prior to the revocation of his membership.  We do not directly address their argument because we conclude that the trial court erred as a matter of law in assuming that judicial intervention into the disciplinary proceedings of a social organization was permitted upon a finding only of bias.

Voluntary associations have great discretion when conducting their internal affairs, especially when their conduct relates to the interpretation and enforcement of their rules and regulations.  
Finn
, 289 Ill. App. 3d at 568;  
Lee
, 285 Ill. App. 3d at 558.  "On the rare occasions when our supreme court has relaxed the rule of nonintrusion in the affairs of voluntary associations absent mistake, fraud, collusion, or arbitrariness, the court has found a substantial property, contract, or other economic right that implicates due process."  
Lee
, 285 Ill. App. 3d at 559; see also 
Van Daele v. Vinci
, 51 Ill. 2d 389, 394 (1972); 
Finn
, 289 Ill. App. 3d at 568. 

Because the BSA is a social organization, Werst's scout membership did not constitute an economic, contract, or property interest.  See 
Lee
, 285 Ill. App. 3d at 559 (no substantial property, contract, or other economic right that implicated due process found in examining a player's right to play hockey in an amateur league of voluntary participants; right examined in light of whether league followed its rules and regulations and whether there was mistake, fraud, collusion, or arbitrariness); 
cf
. 
Van Daele
, 51 Ill. 2d at 395 ("We agree 'that a private organization, particularly if tinged with public stature or purpose, may not expel or discipline a member adversely affecting substantial property, contract or other economic rights, except as a result of fair proceedings which may be provided in organization by-laws, carried forward in an atmosphere of good faith and fair play.'  
(McCune v. Wilson (Fla. 1970), 237 So.2d 169, 173.)
  The rationale for this position as enunciated in 
McCune
 results from the character of the organization, 
i.e.
 its assumption of a purpose which exceeds merely that of a social organization and its endeavor to benefit from various State and Federal laws").  

Here, the trial court found that Werst was not granted a fair hearing due to the potential bias by certain scout leaders and certain committee members who considered his membership status.  Specifically, the court found that Harrington, whom it termed Werst's "primary accuser," was on the committee that decided to revoke Werst's membership.  Next, it found that Cook compromised the review process by communicating extraneous information to the review committees and predicted dire consequences if the committees overturned the revocation decision.  We conclude that, without more, such as a finding of fraud or collusion, a finding of mere bias in the proceedings of a social organization is not sufficient to invoke an exception to the rule against judicial interference.  See 
Van Daele
, 51 Ill. 2d at 395.  Accordingly, we conclude that the court erred as a matter of law and therefore abused its discretion in considering Werst's claim in terms of whether the review process was tinged with bias. 

3.  
Collusion

Finally, the trial court found that certain key employees' animus toward Werst suggested collusion.  Such a finding, if warranted, would permit judicial intervention into the association's disciplinary affairs.  See, 
e.g.
, 
Lee
, 285 Ill. App. 3d at 559.  However, we conclude that the trial court abused its discretion in granting declaratory relief based upon its finding of collusion because there was no evidence presented upon which the court could reasonably make such a finding.  

Collusion is defined as "[a]n agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law."  Black's Law Dictionary 264 (6th
 ed. 1990).  There was no evidence that any individuals agreed to defraud Werst of his membership.  The letters Cook wrote and/or forwarded to the regional and national review committees, although arguably exhibiting evidence of some bias against Werst, are not sufficient to indicate that Cook and any other scout employee colluded to defraud Werst of his scout membership.  Indeed, the evidence shows that, despite warnings from a superior in the scout hierarchy not to do so, Werst permitted an expelled member to participate in scout activities.

Werst maintains that certain scout employees colluded to revoke his membership without giving him warning or an opportunity to defend himself.   However, his argument focuses on procedural issues and does not touch upon any conduct that can be characterized as fraudulent or deceitful.  Nevertheless, he is not correct because he did have the opportunity, as we discussed above, to present his version of the facts to the regional review committee.  Furthermore, he acknowledged that he did not heed warnings by a scout superior--Harrington--to stop permitting an expelled member to participate in scout activities.  

In summary, we conclude that the trial court abused its discretion when it found in favor of Werst on his declaratory judgment count.

B.  Werst's Appeal

In his appeal, Werst argues that the trial court erred in refusing to grant him the additional relief he requested in his posttrial motion.  He asserts that, when the court ordered a new hearing on the issue of revocation of his membership, it implicitly found that he was still a scout member.  He reasons that a declaration that he remained a member was necessary and proper for the court to make a complete determination of the issues before it. 

Given our disposition of the cross-appeal, we need not address whether the trial court should have declared that Werst remained a scout member.  Werst's argument is moot.

IV.  CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded.

Reversed and remanded.

O'MALLEY, P.J., and GILLERAN JOHNSON, J., concur.